# EXHIBIT E

Transcript of the Testimony of

**Juliene Harrod**

**Date:**

March 27, 2019

**Case:**

STACEY ODDO vs UNION PACIFIC RAILROAD

1    Q.   Are those documents mentioned in any of your
2  title work or survey work?
3    A.   I don't believe they're listed in John's
4  stuff, but I think they do pertain.
5    Q.   John -- and by that John, you mean John Cones?
6    A.   John Cones.
7    Q.   Not John Burkland?
8    A.   Yes.  Yes.  I'm sorry.
9    Q.   But they do pertain to the property?
10   A.   I believe so.
11   Q.   And do you have copies of those documents?
12   A.   I do.
13   Q.   Do you have them with you?
14   A.   I have some of them with me, yes.
15   Q.   And they're from -- and they were grants from
16  someone named Tod?
17          THE WITNESS:  Do you remember their first
18  name?  Oh, you can't speak.  I'm sorry.
19   A.   Yes.  Tod, the last name, and it's like T-O-D,
20  Tod.
21   Q.   (BY MS. SANDS)  But they're not in the title
22  work or the survey work?
23   A.   Yes.  They're in the title work as far as what
24  I was going over myself.  They're not specifically
25  listed in the title work from Courthouse Specialists.

 1              Courthouse Specialists, first, could not
 2    find the railroads, but then counsel was able to find
 3    some documents that pertained to the railroad, and then
 4    Courthouse Specialists provided us with some more
 5    documents to the railroad.
 6         Q.   So how would I -- like what of the materials
 7    that you -- that have been provided to me from you as
 8    the surveyor and -- and Mr. Cones as the title work
 9    would tell me that those documents pertain to the Oddo
10    and Burkland property?
11         A.   Well, they talk about the 450 acres that I
12    believe some of this was all part of.  And you have to
13    go way back because it mentions tracts of land that
14    nobody knows exactly where they are, but when you start
15    running the chain of title down, then you start finding
16    out, oh, hey, that was part of this Sam Allen piece or
17    that was part of this piece over here.
18              It's just a matter of trying to read
19    those deeds and put them together.  And a lot of times
20    we get a lot more information than what we asked for,
21    and you have to try and sift through it and see if it's
22    helpful.  And a lot of times it is.  A lot of times
23    it's not.
24         Q.   So other than recreating what you did, how
25    would I -- what could I look at in -- in your material

1  that would tell me that the Tod deeds pertain to these
2  lots?
3       A.   I think you would just have to look at the Tod
4  deeds yourself, and I don't know that that deed by
5  itself would particularly say that it does.
6       Q.   Okay.  So how do you know looking at the Tod
7  deeds that it relates to the railroad and relates to
8  these lots?
9       A.   I don't know that for a fact.  It crosses, I
10 believe, a 450-acre tract that was one of the original,
11 what they called subdivisions of the Ritson Morris
12 league.
13                They mention a map, which nobody seems to
14 be able to find, and then there was a sketch of it
15 somewhere, but they talk about the railroad running
16 through the Ritson Morris.  And the Ritson Morris
17 league, you can determine where that's at.
18      Q.   Is this the deed that you're talking about,
19 ma'am?  I'm going to mark this as No. 23.
20                (Harrod Exhibit No. 23 was marked.)
21      Q.   (BY MS. SANDS)  And for the record, it has in
22 the left-hand kind of margin of the actual document
23 No. 2942, and it's Bates labeled page four from the
24 plaintiffs.
25      A.   Yes.

```
 1      A.   Correct.
 2      Q.   And you are unable to definitively apply 2942
 3 to any of the lots, which is Exhibit --
 4      A.   The Tod.
 5      Q.   -- 23?
 6      A.   Yes.
 7      Q.   Now, when you did the -- the work in this
 8 case, plaintiffs' counsel did not ask you to do a
 9 railroad survey to survey the Seabrook industrial lead
10 at issue in this case?
11      A.   I was not asked to do a survey of any
12 property.
13      Q.   Okay.  Good clarification.  Sorry.  You were
14 not asked to have title run or do a drawing of the
15 railroad easement in this case.  Correct?
16      A.   Well, the railroad easement, yes, just as far
17 as it was the adjoiner to what we were doing, and it's
18 called for, you know, in some documents.
19           To actually do a ownership map of the
20 actual railroad, surveyors don't give title opinions.
21 So all I could do is the same thing; list, go through,
22 get research, rely on what they send me as to who owns
23 whatever.
24           It's not my job to determine who owns it.
25 I just need to determine the boundaries of the property
```

```
 1  if we're doing a boundary survey.
 2       Q.   Okay.  And you rely -- relied on Courthouse
 3  Specialists, specifically John Cones, to do that for
 4  you?
 5       A.   Yes.
 6       Q.   Okay.  And -- and you were not asked to give a
 7  broader view of the railroad easement grant outside of
 8  the relation to these specific lots.  Correct?
 9       A.   Correct.
10       Q.   Okay.  You -- you mentioned earlier that you
11  asked Mr. Cones to pull the -- any of the easement
12  grants that he could find in relation to these
13  properties.  Is that correct?
14       A.   Yes.
15       Q.   Okay.  So he has pulled and identified any
16  easement grants.  Do you know how he did that process?
17  Let me ask you that.
18       A.   I've never been to where they run their
19  records.  Normally, they have some type of a hard copy
20  plant or online plant, and they'll search them.
21  They're probably separated by parent tracts or by
22  surveys, meaning the Ritson Morris whole entire league
23  and whoever adjoins it.
24                They're probably broken down in larger
25  parent tracts, and they run those records.  I have no
```

```
 1  idea.  They have run --
 2      Q.  Okay.
 3      A.  -- sheets that show ownership transactions
 4  back and forth.  They have all the information from
 5  minerals and easements and things like that that you
 6  don't normally get online in Harris County.
 7      Q.  Okay.  So do you know if he pulled only the
 8  easements that were granted by the Oddos or the
 9  Burklands or whether he may have grant -- pulled the
10  easements granted by anyone on that property?
11      A.  He would have pulled the easements granted by
12  anyone on these tracts of land because he was asked to
13  do the ownership back from -- this started in 1888, for
14  example, on the nine acres.  So he would have pulled
15  easements that affected all of these documents that he
16  listed.
17      Q.  Okay.  Okay.  And so to talk -- I need to talk
18  to him to understand exactly what he did and whether or
19  not this document ever came up in anything he did?
20      A.  Correct.
21      Q.  Okay. Now -- and I'm sorry.  This is probably
22  duplicative, but had you seen this document before to
23  your knowledge?
24      A.  No.
25      Q.  Okay.
```